## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOWN OF BABYLON, NY; TOWN OF BROOKHAVEN, NY; TOWN OF HEMPSTEAD, NY; TOWN OF ISLIP, NY; TOWN OF OYSTER BAY, NY; TOWN OF NORTH HEMPSTEAD, NY; TOWN OF HUNTINGTON, NY; TOWN OF RAMAPO, NY; TOWN OF SMITHTOWN, NY, | Case No. 2:22-CV-01681-KAM-AYS |
| Plaintiffs, | Hon. Kiyo A. Matsumoto |
| v. | |
| LETITIA JAMES, in her official capacity as Attorney General for the State of New York, | |
| Defendant. | |

## FOURTH AMENDED COMPLAINT

1.      The Plaintiffs in this case are incorporated towns in New York State who bear responsibility for protecting the health and safety of more than three million New York citizens. They bring this case in response to a New York statute, Senate Bill No. 7194, which purported to retroactively extinguish their valuable pending claims against producers and distributors of opioid drugs—while at the same time arbitrarily permitting the equivalent pending claims of other plaintiffs to survive.

2.      Plaintiffs had previously brought claims against the producers and distributors of opioid drugs who had implemented a systematic effort to get doctors to prescribe opioids for long-term management of chronic pain. While the producers and distributors made billions of dollars, their cynical scheme turned millions of Americans into addicts and created a scourge of overdoses and crime.

3.      The opioid crisis stretched the resources of towns and villages across New York to their breaking point. These towns and villages were forced to devote their scarce resources to a response to the crisis, which inevitably came at the expense of other priorities, such as preparations for other emergencies and replacements for aging fleets of EMS response vehicles and ambulances.

4.      Plaintiffs brought claims in their proprietary capacities against opioid producers and distributors: In other words, these claims were equivalent to the claims a private plaintiff can bring. Plaintiffs simply sought money damages for the financial losses they had suffered as a consequence of the producers' and distributors' wrongdoing.

5.      New York State enacted Senate Bill No. 7194 in order to facilitate its own settlement with the producer and distributor defendants. Meanwhile, the State cooperated with other "subdivisions" of the State, including Suffolk County and Nassau County, to negotiate settlements with the producer and distributor defendants. The State did not, however, cooperate with the Plaintiffs in this case.

6.      Signed into law on June 29, 2021, Senate Bill No. 7194 drew an arbitrary line between those "subdivisions" who filed their claims prior to a cutoff date of June 30, 2019, and those who filed later. It purported to retroactively extinguish only those claims that were filed between the arbitrary June 30, 2019, cutoff date and June 29, 2021.

7.      At the time of enactment, it was plain to all which "subdivision" plaintiffs the law favored. In particular, it advantaged Suffolk County and Nassau County, ultimately rewarding them with substantial cash settlements. Those settlements came at the expense of the towns and villages that stand on the front line in the opioid crisis and have used their own funds for the battle—funds that the towns and villages raise themselves through property taxes on the citizens

they are entrusted with protecting.

8.    The United States Constitution and the Constitution of the State of New York prohibit this unjust result. Senate Bill No. 7194 violates the rights to substantive due process, equal protection under the law, and freedom to petition under both federal and New York law. It violates the New York Constitution for the additional and independent reason that that it was enacted with complete disregard for the procedural safeguards that apply to a "special law" affecting some, but not all, of the State's counties, towns, and villages.

9.    Through this action, Plaintiffs seek a declaration of their constitutional rights and an injunction barring enforcement of this unsound and unlawful statute.

## PARTIES

10.    Plaintiff Town of Hempstead, NY, is an incorporated town with a population of approximately 768,000 located in Nassau County.

11.    Plaintiff Town of Brookhaven, NY, is an incorporated town with a population of approximately 482,000 located in Suffolk County.

12.    Plaintiff Town of Islip is an incorporated town with a population of approximately 331,000 located in Suffolk County

13.    Plaintiff Town of Oyster Bay is an incorporated town with a population of approximately 298,000 located in Nassau County.

14.    Plaintiff Town of North Hempstead is an incorporated town with a population of approximately 231,000 located in Nassau County

15.    Plaintiff Town of Babylon, NY, is an incorporated town with a population of approximately 210,000 located in Suffolk County

16.    Plaintiff Town of Huntington, NY an incorporated town with a population of approximately 202,000 located in Suffolk County.

17.     Plaintiff Town of Ramapo, NY is an incorporated town with a population of approximately 137,000 located in Rockland County.

18.     Plaintiff Town of Smithtown, NY, is an incorporated town with a population of approximately 116,000 located in Suffolk County.

19.     Together, the Plaintiff towns have responsibility for protecting the health and safety of more than three million citizens of the state of New York.

20.     Defendant Letitia James, sued in her official capacity, is the Attorney General for the State of New York.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims arising under the federal Constitution.

22.     Venue lies in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTS

### I.     THE OPIOID CRISIS

23.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet as well as generic forms of oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin and are regulated as controlled substances. Opioids can relieve pain; they can also create a euphoric high. As a result, they are highly addictive. Sufficient doses can slow the user's breathing, causing respiratory depression and death.

24.     Prior to a sophisticated campaign by opioid producers and distributors, opioids were recognized as an effective treatment for short-term post-surgical and trauma-related pain, as well as for palliative care. Controlled studies were limited to short-term use and in managed

settings (such as hospitals), where the risk of addiction and other adverse outcomes was much lower. Although opioid producers and distributors knew that the drugs were too addictive and debilitating for long-term use treating chronic non-cancer pain, they nevertheless plotted to create a sea change in medical and public perception that would permit their use not just for acute and palliative care, but for long-term treatment of more common aches and pains like lower back pain, arthritis, and headaches.

25.     Opioid producers and distributors accomplished this sea change by spending hundreds of millions of dollars to (a) develop and disseminate scientific and educational materials and advertising that misrepresented the benefits and risks of using opioids for long-term treatment of chronic pain; (b) deploy sales representatives who visited doctors and delivered misleading messages about opioid use; (c) recruit prescribing physicians as paid speakers in order to secure their "brand loyalty"; (d) fund and encourage selected doctors, known as "key opinion leaders," to publish misleading studies, deliver scripted and misleading talks, present deceptive continuing medical education programs, and otherwise promote opioid use; (e) fund and assist seemingly neutral and credible professional societies and patient advocacy groups that developed educational materials and treatment guidelines urging doctors to prescribe opioids for long-term use in treating chronic pain.

26.     These efforts were wildly successful in expanding opioid abuse. By 2012, health care providers were writing enough prescriptions for opioid painkillers to medicate every adult in America around the clock for a month. Twenty percent of all doctors' visits in 2010 resulted in an opioid prescription, nearly double the rate in 2000. Formerly a niche drug, opioids became the most prescribed class of drugs. This generated billions of dollars in revenue for opioid producers and distributors.

27.    The result has been catastrophic. According to the CDC, prescription opioid use contributed to more than 16,000 annual overdose deaths by 2010—by which time opioids accounted for 40% of drug-related emergency department visits and 40% of drug poisoning deaths. By 2014, nearly two million Americans were either abusing opioids or dependent on them.

28.    Meanwhile, the dramatic increase in opioid prescriptions to treat chronic pain resulted in a population of addicts seeking the drugs. These addicts were prone to increasingly desperate tactics—including doctor-shopping, use of aliases, and crime—to satisfy their cravings. Rather than displacing heroin, opioids triggered a resurgence in its use. Because heroin produces a high similar to the high caused by prescription opioids, but is often cheaper, addicts who started on opioids often began to use heroin as well. The common result is a cycle of drug use and crime.

## II.    THE DEVASTATING EFFECT ON PLAINTIFFS

29.    The opioid crisis has had a devasting effect on towns and villages throughout New York, including the towns that are Plaintiffs in this action.

30.    The emergency medical services ("EMS"), fire departments, and police departments operated by towns and villages typically have the main responsibility for providing the first responses to health emergencies and crimes. The opioid crisis has buried the towns' and villages' first responders under an avalanche of health emergencies and crimes, consuming their resources and diverting those resources from other priorities.

31.    The Town of Brookhaven provides a representative example. Brookhaven is located in Suffolk County. Suffolk County does not provide, or fund, EMS. Instead, the Town of Brookhaven contracts with the Brookhaven Ambulance Co., Inc. (the "BAC") to provide EMS to its residents. The Town raises funds through its residents' property taxes; it then allocates a

portion of the funds to support the BAC in providing EMS to Brookhaven's residents. The BAC is a not-for-profit corporation staffed largely by volunteers.

32.     Prior to the opioid crisis, the typical medical emergencies to which the BAC was called to respond were things like chest pain and diabetic emergencies. In recent years, however, the BAC has been overwhelmed by emergencies caused by opioid addiction. Not only has the volume of emergency calls risen dramatically, but the resources required to respond to those calls has changed.

33.     Employees and volunteers have required training on treating opioid overdoses and on the medications like Narcan that are used for such treatments. The EMS services have had to acquire and maintain supplies of those medications. Opioid addicts can become violent when they are revived following an overdose. As a result, more personnel are required to respond to calls related to opioid overdoses, and those personnel require supplies such as ballistic armor for protection.

34.     Responding to a huge volume of opioid-related emergencies takes an emotional toll on personnel, leading to burnout. Replacing personnel who quit requires an investment of resources in recruiting replacement personnel, and then a further investment of resources in training these replacement personnel. The BAC has also developed an educational program to raise awareness in the community about the dangers opiates pose.

35.     All of this requires money, which the BAC has had to divert away from filling other needs, such as preparations for responding to other types of emergencies. The BAC has also delayed replacement of first emergency response utility vehicles (which have a replacement cost of approximately $100,000) and ambulances (which have a replacement cost of approximately $400,000). Delaying replacement of vehicles that otherwise would have been

retired already is only a temporary solution. Saddled with an aging fleet, the BAC will inevitably face the need to replace vehicles whose usable life cannot be extended any longer without compromising safety.

36.     The circumstances Brookhaven and the BAC have faced as a result of the opioid crisis are typical of those faced by the first responders from towns and villages throughout the State of New York, including the other Plaintiffs in this action.

## III.     PLAINTIFFS' LITIGATION AGAINST THE PRODUCER AND DISTRIBUTOR DEFENDANTS

37.     On December 10, 2019, the Plaintiffs in this case (together with many other similarly situated Plaintiffs) filed a complaint in the Supreme Court for the State of New York for Suffolk County. Plaintiffs named multiple defendants involved in the production and distribution of opiate drugs, seeking to hold these defendants responsible for the financial harm Plaintiffs had suffered as a result of the opioid crisis. The case is captioned as *Village of Amityville, et al. v. Teva Pharmaceuticals, et al.*, Index No. 400031/2019 (N.Y. Sup. Ct. Suffolk Cnty.) (the "State Court Action").

38.     Plaintiffs' claims against the producer and distributor defendants included claims in the Plaintiffs' proprietary capacities—in other words, claims that were equivalent to the claims a private plaintiff can bring. At their core, those claims were based on the fact that the producer and distributor defendants, through conduct that was negligent and that also violated various statutory provisions, had caused Plaintiffs tremendous financial harm. Through their lawsuit, Plaintiffs sought to recover damages to compensate them for their own financial harm.

39.     Commensurate with the broad swathe the opioid crisis has cut across America, a large number of plaintiffs have brought claims against the same producer and distributor defendants. Other plaintiffs included the State of New York (together with many other states)

and the Counties of Nassau and Suffolk (together with many other counties), as well as many other towns and villages situated similarly to the Plaintiffs in this case.

40.    The many plaintiffs shared a common interest in discovering the full truth of the producer and distributor defendants' misconduct and holding them responsible.  However, it was inevitable that conflicts among the various plaintiffs' interests would arise when it came time to apportion the recoverable assets of the producer and distributor defendants—which are vast but nevertheless finite.

41.    This case arises from the conflict of interest that arose between, on the one hand, the Plaintiffs in this case and their similarly situated co-plaintiffs in the State Court Action and, on the other hand, the State of New York and the Counties of Nassau and Suffolk.

## IV.    THE STATE OF NEW YORK FACILITATES ITS OWN SETTLEMENT WITH ENACTMENT OF SENATE BILL 7194

42.    During the summer of 2021, the State of New York, acting through the Attorney General's Office, was in the process of negotiating a settlement with certain distributor defendants and producer defendants.

43.    On June 5, 2021, Bill No. 7194 was introduced in the New York Senate. The Bill was intended to facilitate the settlement discussions that were then underway. It contemplated the creation of an opioid settlement fund administered by the State. It also purported to extinguish some—but not all—of the claims by State "subdivisions" including "each county, city, town, village, or special district in the state of New York." A copy is attached as Exhibit A.

44.    The relevant provision states as follows:

> Limitation on authority of government entities to bring lawsuits. No government entity shall have the authority to assert released claim against entities released by the department of law in a statewide opioid settlement agreement executed by the department of law and the released party on or after June first, two thousand twenty-one. Any action filed by a government entity after June thirtieth, two thousand nineteen asserting released claims

against a manufacturer, distributor, or dispenser of opioid products shall be extinguished by operation of law upon being released by the department of law in such statewide opioid settlement agreement.

45.     The Bill thus operated to extinguish some pending claims retroactively—but not all such claims. The cutoff date of June 30, 2019, set an arbitrary line between the subdivisions whose claims would be extinguished and those whose claims would survive.

46.     When the Bill was introduced, it was plain to all which "subdivisions" the Bill would favor and which it would not, because it was a matter of public record which subdivisions had filed claims prior to the cutoff date and which had not. The Bill favored Nassau and Suffolk Counties. It did not favor Plaintiffs in this case or their co-plaintiffs in the State Court Action.

47.     Senate Bill No. 7194 was signed into law on June 29, 2021. Just three weeks later, on July 20, 2021, the State of New York, together with the County of Nassau and the County of Suffolk, entered into a settlement with three distributor defendants. The settlement agreement specifically provided for payment of significant attorneys' fees to just two outside law firms (Napoli Shkolnik PLLC and Simmons Hanly LLC), which represented subdivisions that were, or were expected to be, "Participating Subdivisions." Nassau County and Suffolk County received settlements in cash, with no restriction on their use of the funds they received.

48.     With the spoils thus divided, the Plaintiffs in this case (together with their co-plaintiffs in the State Court Action) are out of luck. Before enactment of Senate Bill No. 7194, Plaintiffs were situated similarly to the State of New York, the Counties of Nassau and Suffolk, and towns and villages throughout the State insofar as they had valuable and timely-filed claims pending against the producer and distributor defendants. If Senate Bill No. 7194 were enforceable, it would mean that those valuable claims simply disappeared on June 29, 2021—while the claims of other "Participating Subdivisions" survived. This would leave Plaintiffs with no recovery from the producer and distributor defendants for the financial harm they have

suffered as a result of those defendants' misconduct.

49.     The consequences are real and they matter: Plaintiffs will struggle to replace their aging fleets of EMS vehicles; they will struggle to fund efforts to recruit employees and volunteers; they will struggle to purchase the medications and equipment that those employees and volunteers need to serve on the front line of the battle against the opioid crisis; and with their coffers depleted by that battle, they will struggle in preparing to handle other emergencies. Those consequences will not be suffered similarly by the Counties of Nassau and Suffolk, whose coffers have been filled.

50.     Plaintiffs bring this action seeking a declaration that the Constitutions of the United States and the State of New York prohibit this unjust result.

## CLAIMS

51.     Plaintiffs incorporate paragraphs 1 through 50 into each of the below counts as if fully set forth therein.

### COUNT ONE: DECLARATORY JUDGMENT—VIOLATION OF FOURTEENTH AMENDMENT TO FEDERAL CONSTITUTION—SUBSTANTIVE DUE PROCESS

52.     Plaintiffs had property rights in their claims for monetary damages against the producer and distributor defendants.

53.     Plaintiffs also had a fundamental right to pursue those claims.

54.     Senate Bill No. 7194 purported to retroactively extinguish Plaintiffs' claims in an arbitrary and irrational manner.

55.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

### COUNT TWO: DECLARATORY JUDGMENT—VIOLATION OF FOURTEENTH AMENDMENT TO FEDERAL CONSTITUTION—EQUAL PROTECTION

56.     Senate Bill No. 7194 discriminates arbitrarily in its retroactive extinguishment of

some, but not all, of the claims by State "subdivisions" that were already pending at the time of its enactment.

57.     As of June 29, 2021, when Senate Bill No. 7194 was enacted, it was evident which subdivision plaintiffs it would favor and which it would not.

58.     As of June 29, 2021, when Senate Bill No. 7194 was enacted, there was no rational basis for retroactively extinguishing only those claims by subdivision plaintiffs that were filed in between the arbitrary cutoff date of June 30, 2019, and June 29, 2021.

59.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

**COUNT THREE: DECLARATORY JUDGMENT—VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS TO FEDERAL CONSTITUTION— RIGHT OF PETITION**

60.     Plaintiffs had a First Amendment right to petition the courts to pursue their claims against the producer and distributor defendants.

61.     In reliance on the existence their right to petition, Plaintiffs invested their efforts and resources into pursuing their claims against the producer and distributor defendants.

62.     Senate Bill No. 7194 purported to retroactively extinguish Plaintiffs' claims in an arbitrary and irrational manner, and in so doing placed an impermissible burden on Plaintiffs' First Amendment interests.

63.     Senate Bill No. 7194 has an impermissible chilling effect because it deters Plaintiffs from ever pursuing any claims when the State of New York may have a conflicting interest in pursuing its own claims against the same defendants.

64.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

## COUNT FOUR: DECLARATORY JUDGMENT—VIOLATION OF NEW YORK CONSTITUTION ARTICLE IX, § 2(b)(2)

65.     Article IX, § 2(b)(2) of the New York Constitution provides that the legislature of the State of New York:

> Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of two-thirds of its chief executive officer concurred in by a majority of such membership, or (b) except in the case of the city of New York, on certificate of necessity from the governor reciting facts which in the judgment of the governor constitute an emergency requiring enactment of such law and, in such latter case, with the concurrence of two thirds of the members elected to each house of the legislature.

66.     The provision thus distinguishes between a "request" and a "concurrence" of the legislature's members.

67.     Senate Bill No. 7194 is a "special law" under Article IX, § 3(d)(4) because at the time of its enactment, it was clear that it purported to extinguish the pending claims of some, but not all, towns and villages against the producer and distributor defendants. Accordingly, it is "[a] law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns, or villages."

68.     There was never a "request" by two-thirds of the legislature's members or any other circumstances that would permit enactment of a "special law" in the case of Senate Bill No. 7194. It was instead introduced by two State Senators, Senators Rivera and Harkham.

69.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

## COUNT FIVE: DECLARATORY JUDGMENT—VIOLATION OF NEW YORK CONSTITUTION ARTICLE I, § 6—SUBSTANTIVE DUE PROCESS

70.     Plaintiffs had property rights in their claims for monetary damages against the producer and distributor defendants.

71.     Plaintiffs also had a fundamental right to pursue those claims.

72.     Senate Bill No. 7194 purported to retroactively extinguish Plaintiffs' claims in an arbitrary and irrational manner.

73.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

## COUNT SIX: DECLARATORY JUDGMENT—VIOLATION OF NEW YORK CONSTITUTION ART. I, § 11—EQUAL PROTECTION

74.     Senate Bill No. 7194 discriminates arbitrarily in its retroactive extinguishment of some, but not all, of the claims by State "subdivisions" that were already pending at the time of its enactment.

75.     As of June 29, 2021, when Senate Bill No. 7194 was enacted, it was evident which subdivision plaintiffs it would favor and which it would not.

76.     As of June 29, 2021, when Senate Bill No. 7194 was enacted, there was no rational basis for retroactively extinguishing only those claims by subdivision plaintiffs that were filed in between the arbitrary cutoff date of June 30, 2019, and June 29, 2021.

77.     A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

## COUNT SEVEN: DECLARATORY JUDGMENT—VIOLATION OF NEW YORK CONSTITUTION ARTICLE I, §§ 8–9—RIGHT OF PETITION

78.     Plaintiffs had a right under Article I, §§ 8–9 of the New York Constitution to petition the courts to pursue their claims against the producer and distributor defendants.

79.     In reliance on the existence of their right to petition, Plaintiffs invested their efforts and resources into pursuing their claims against the producer and distributor defendants.

80.     Senate Bill No. 7194 purported to retroactively extinguish Plaintiffs' claims in an arbitrary and irrational manner, and in so doing placed an impermissible burden on Plaintiffs'

First Amendment interests.

81.    Senate Bill No. 7194 has an impermissible chilling effect because it deters Plaintiffs from ever pursuing any claims when the State of New York may have a conflicting interest in pursuing its own claims against the same defendants.

82.    A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

83.    A controversy exists between the parties as to the enforceability of Senate Bill No. 7194 under these circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

a.    That the Court enter judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 declaring Senate Bill No. 7194 unconstitutional under the United States Constitution and the Constitution of the State of New York;

b.    That this Court permanently enjoin Defendant from enforcing Senate Bill No. 7194;

c.    In the alternative, that this Court order that to the extent Defendant enforces Senate Bill No. 7194, the clause providing that "[a]ny action filed by a government entity after June thirtieth, two thousand nineteen asserting released claims against a manufacturer, distributor, or dispenser of opioid products shall be extinguished by operation of law upon being released by the department of law in such statewide opioid settlement agreement" must be stricken; and

d.    That this Court order such other and further relief as it may deem just and proper.

Dated:  March 9, 2023

/s/ *Nathan A. Holcomb*
NATHAN A. HOLCOMB ESQ., PC
125 Park Avenue, Suite 2618
New York, New York 10017
nholcomb@holcombpc.com
646.819.0303

Amos E. Friedland (*admission pending*)
Edward J. Normand
FREEDMAN NORMAND FRIEDLAND LLP
99 Park Avenue, Suite 1910
New York, New York 10016
afriedland@fnf.law
tnormand@fnf.law
646.970.7519

Mark A. Tate (*pro hac vice*)
TATE, GROSSMAN & KELLY
P.O. Box 9060
Savannah, Georgia 31412
tlgservice@tatelawgroup.com
912.234.3030

*Counsel for Plaintiffs*

# EXHIBIT A

# STATE OF NEW YORK

7194

2021-2022 Regular Sessions

# IN SENATE

June 5, 2021

———————

Introduced  by Sens. RIVERA, HARCKHAM -- read twice and ordered printed,
   and when printed to be committed to the Committee on Rules

AN ACT to amend the state finance law, the mental hygiene law,  and  the
   executive law, in relation to establishing an opioid settlement fund

   *The People of the State of New York, represented in Senate and Assem-
   bly, do enact as follows:*

1   Section 1. The state finance law is amended by adding  a  new  section
2   99-nn to read as follows:
3   *§ 99-nn. Opioid settlement fund. 1. There is hereby established in the*
4   *joint custody of the state comptroller and the commissioner of taxation*
5   *and finance a special fund to be known as the "opioid settlement fund".*
6   *2. Money allocated to the opioid settlement fund shall be kept sepa-*
7   *rate and shall not be commingled with any other funds in the custody of*
8   *the state comptroller.*
9   *3. Money expended from such fund shall be used to supplement and not*
10  *supplant or replace any other funds, including federal or state funding,*
11  *which would otherwise have been expended for substance use disorder*
12  *prevention, treatment, recovery or harm reduction services or programs.*
13  *Provided further, general operating funds or baseline funding shall not*
14  *be reduced due to monies expended from the fund.*
15  *4. Such fund shall consist of money received by the state as a result*
16  *of the settlement of litigation with entities that manufactured, sold,*
17  *distributed, dispensed or promoted opioids, made in connection with*
18  *claims arising from the manufacturing, marketing, distributing, promot-*
19  *ing or dispensing of opioids, as well as any funds received by the state*
20  *as a result of a judgment, stipulation, decree, agreement to settle,*
21  *assurance of discontinuance, or other legal instrument resolving any*
22  *claim or cause of action against manufacturers, distributors, dispensers*
23  *or vendors of opioids and related entities arising out of activities*
24  *alleged to have contributed to increases in opioid addiction, whether*
25  *filed or unfiled, actual or potential, and whether arising under common*

EXPLANATION--Matter in **italics** (underscored) is new; matter in brackets

   [~] is old law to be omitted.

LBD10289-21-1

1  law, equity, or any provision of law, and all other monies appropriated,
2  credited, or transferred thereto from any other fund or source pursuant
3  to law. All monies shall remain in such fund unless and until directed
4  by statute or appropriation.
5     5. Notwithstanding subdivision eleven of section four of this chapter,
6  or subdivision sixteen of section sixty-three of the executive law,
7  monies from the opioid settlement fund shall be available following
8  appropriation by the legislature and shall only be expended on eligible
9  expenditures as defined in section 25.18 of the mental hygiene law for
10 prevention, treatment, harm reduction and recovery services related to
11 substance use disorders and co-occurring mental illnesses in New York
12 state pursuant to the terms of the statewide opioid settlement agree-
13 ments as defined in section 25.18 of the mental hygiene law. Funding
14 shall be distributed regionally and to ensure adequate geographic
15 disbursement across the state in accordance with the statewide opioid
16 settlement agreements. In addition to programs and services overseen by
17 the office of addiction services and supports, funding may also be
18 expended on programs and services overseen by the department of health,
19 the office of mental health, the division of housing and community
20 renewal or any other agency that may oversee an appropriate program or
21 service that is considered an eligible expenditure as provided under
22 section 25.18 of the mental hygiene law. Funding decisions shall include
23 an emphasis on supporting programs that are culturally, linguistically
24 and gender competent, trauma-informed, evidence-based and, where appro-
25 priate, employ individuals with lived experience as part of the services
26 provided.
27    § 2.  The mental hygiene law is amended by adding a new section 25.18
28 to read as follows:
29 § 25.18 Statewide opioid settlements.
30    (a) Definitions. As used in this section, the following terms shall
31 have the following meanings: 1. Eligible expenditures shall include
32 services and programs that are consistent with the approved uses and
33 terms of the statewide opioid settlement agreement and include but not
34 be limited to, programs:
35    (i) to prevent substance use disorders through an evidence-based
36 youth-focused public health education and prevention campaign, including
37 school-based prevention and health care services and programs to reduce
38 the risk of substance use by school-aged children;
39    (ii) to develop and implement statewide public education campaigns to
40 reduce stigma against individuals with a substance use disorder, provide
41 information about the risks of substance use, best practices for
42 addressing substance use disorders, and information on how to locate
43 services that reduce the adverse health consequences associated with
44 substance use disorders or provide treatment for substance use disor-
45 ders;
46    (iii) to provide substance use disorder treatment and early recovery
47 programs for youth and adults, with an emphasis on programs that provide
48 a continuum of care that includes screening and assessment for substance
49 use disorders and co-occurring disorders, active treatment, family
50 involvement, case management, relapse management for substance use and
51 other co-occurring behavioral health disorders, vocational services,
52 literacy services, parenting classes, family therapy and counseling
53 services, crisis services, recovery services, evidence-based treatments,
54 medication-assisted treatments, including medication assisted treatment
55 provided in correctional facilities, psychiatric medication, psychother-
56 apy and transitional services programs;

1  (iv) to provide harm reduction counseling and services to reduce the
2  adverse health consequences associated with substance use disorders,
3  including overdose prevention and prevention of communicable diseases
4  related to substance use, provided by a substance use disorder service
5  provider or qualified community-based organization;
6  (v) to provide housing services for people who are recovering from a
7  substance use disorder. Such housing services shall be appropriate,
8  based on the individual's current need and stage of recovery. Such hous-
9  ing services may include but are not limited to supportive housing
10  services;
11  (vi) to support community-based programs that reduce the likelihood of
12  criminal justice involvement for individuals who have or are at risk of
13  having a substance use disorder;
14  (vii) to provide programs for pregnant women and new parents who
15  currently or formerly have had a substance use disorder and newborns
16  with neonatal abstinence syndrome; and
17  (viii) to provide vocational and educational training for individuals
18  with or at risk for a substance use disorder.
19  2. "Government entity" means (i) departments, agencies, divisions,
20  boards, commissions and/or instrumentalities of the state of New York
21  including, the department of financial services, the superintendent of
22  the department of financial services, and the New York liquidation
23  bureau, provided however it shall not include the department of law; and
24  (ii) any governmental subdivision within the boundaries of the state
25  of New York, including, but not limited to, counties, municipalities,
26  districts, towns and/or villages, and any of their subdivisions, special
27  districts and school districts, and any department, agency, division,
28  board, commission and/or instrumentality thereof.
29  3. "Participating entities" means participating entities as such term
30  is defined in any statewide opioid settlement agreement.
31  4. "Opioid settlement fund" means the fund created by the statewide
32  opioid agreements and section ninety-nine-nn of the state finance law,
33  the funds of which shall be used or distributed by the commissioners, as
34  authorized by the legislature by statute or appropriation, for the
35  purposes of preventing addiction and reducing the harms caused by the
36  overdose and substance use disorder epidemic consistent with the terms
37  of any statewide opioid settlement agreement.
38  5. "Released claims" means released claims as such term is defined in
39  the statewide opioid settlement agreements.
40  6. "Released entities" means released entities as such term is defined
41  in the statewide opioid settlement agreements.
42  7. "New York subdivisions" means each county, city, town, village, or
43  special district in the state of New York.
44  8. "Statewide opioid settlement agreements" means agreements of state-
45  wide applicability, including but not limited to consent judgments,
46  consent decrees filed or unfiled, and related agreements or documents
47  between the state and certain opioid manufacturers, distributors,
48  dispensers, consultants, chain pharmacies, related entities, and/or the
49  New York subdivisions, to provide remuneration for conduct related to
50  the manufacture, promotion, dispensing, sale, and/or distribution of
51  opioid products. Copies of such agreements, including any amendments
52  thereto, shall be kept on file by the attorney general, who shall make
53  such available for inspection and copying pursuant to the provisions of
54  article six of the public officers law.
55  (b) Eligible expenditures for opioid settlement funds. 1. The legisla-
56  ture shall appropriate funds to be used for eligible expenditures that

1   are consistent with the approved uses and terms of the statewide opioid
2   settlement agreement. Such expenditures shall be distributed regionally
3   and in accordance with the statewide opioid settlement agreements to
4   ensure adequate geographic disbursement across the state.
5     2. New York subdivisions shall apply to the appropriate agency for
6   funding for eligible expenditures consistent with the terms of any
7   statewide opioid settlement agreement. Any New York subdivision which
8   receives funding pursuant to this section shall be required to annually
9   certify to the appropriate state agency in which funding was received
10  that such New York subdivision is utilizing such funds in accordance
11  with the requirements of this section and section ninety-nine-nn of the
12  state finance law.
13    3. Each New York subdivision shall provide a detailed accounting of
14  how the funds were used as well as an analysis and evaluation of the
15  services and programs funded. Such information shall be included in the
16  report provided pursuant to paragraph ten of subdivision (c) of this
17  section.
18    (c) Advisory board establishment and responsibilities. 1. The opioid
19  settlement board is hereby established under the office of addiction
20  services and supports to provide recommendations on how funding received
21  by the opioid settlement fund pursuant to section ninety-nine-nn of the
22  state finance law shall be allocated by the legislature. Recommenda-
23  tions shall be evidenced-based and may take into consideration federal,
24  state or local initiatives and activities that have shown to be effec-
25  tive in preventing and treating substance use disorders as well as main-
26  taining recovery and assisting with the collateral effects of substance
27  use disorders for individuals and their families or support system.
28  Such recommendations shall also take into account any gaps in access to
29  services or programs identified as eligible expenditures and incorporate
30  mechanisms for measurable outcomes for determining the effectiveness of
31  funds expended. The office and any other relevant agency that provides
32  or regulates eligible expenditures shall provide any necessary staff,
33  resources and technical assistance to assist with the functions of the
34  advisory board. Such assistance shall be supported pursuant to an
35  appropriation by the legislature, in accordance with the statewide
36  opioid settlement agreements.
37    2. The opioid settlement board may make recommendations to the legis-
38  lature regarding the addition or removal of any eligible expenditures in
39  response to changing substance use disorder needs in the state. No
40  recommendation may be made to remove an eligible expenditure without
41  three-fourths approval of present board members.
42    3. The opioid settlement board shall consist of nineteen members
43  appointed as follows:
44    (i) the commissioner of addiction services and supports, the commis-
45  sioner of mental health, and the commissioner of health, or their desig-
46  nees, serving as ex-officio non-voting members;
47    (ii) two appointments by the governor;
48    (iii) two appointments by the temporary president of the senate;
49    (iv) two appointments by the speaker of the assembly;
50    (v) two appointments by the attorney general;
51    (vi) one appointment by the mayor of the city of New York; and
52    (vii) seven appointments from a list of nominees submitted, pursuant
53  to a statewide opioid settlement agreement, by an association of coun-
54  ties that represents at least ninety percent of the counties in New
55  York, counting both by number of counties and by population at the time
56  such statewide opioid settlement agreement was finalized. Such appoint-

1  ments shall be selected as follows: two from the temporary president of
2  the senate, two from the speaker of the assembly, one from the minority
3  leader of the senate, one from the minority leader of the assembly and
4  one from the attorney general.
5     4. Each member shall be appointed to serve three-year terms and in the
6  event of a vacancy, the vacancy shall be filled in the manner of the
7  original appointment for the remainder of the term. The appointed
8  members and commissioners shall receive no compensation for their
9  services but shall be allowed their actual and necessary expenses
10 incurred in the performance of their duties as board members.
11    5. Every effort shall be made to ensure a balanced and diverse board,
12 representing the geographic regions and racial and ethnic demographics
13 of the state as well as those with lived experiences of a substance use
14 disorder. Appointed members shall have an expertise in public and
15 behavioral health, substance use disorder treatment, harm reduction,
16 criminal justice, or drug policy. Further, the board shall include indi-
17 viduals with personal or professional experience with substance use and
18 addiction issues and co-occurring mental illnesses as well as providing
19 services to those that have been disproportionately impacted by the
20 enforcement and criminalization of addiction.
21    6. The chairperson of the board and the vice chairperson shall be
22 elected from among the members of the board by the members of such
23 board. The vice chairperson shall represent the board in the absence of
24 the chairperson at all official board functions. A majority of the
25 voting members of the board shall constitute a quorum.
26    7. Members of the board shall not take any action to direct funding
27 from the opioid settlement fund to any entity in which they or their
28 family members have any interest, direct or indirect, or receive any
29 commission or profit whatsoever, direct or indirect. Members of the
30 board shall recuse themselves from any discussion or vote relating to
31 such interest.
32    8. The board shall meet quarterly, to ensure recommendations are
33 updated and consistent with the needs of the state. Such meetings shall
34 be held in accordance with article seven of the public officers law and
35 pursuant to the federal americans with disabilities act of nineteen
36 hundred ninety, as amended.
37    9. On or before November first of each year, beginning November first,
38 two thousand twenty-one, the board shall provide their recommendations
39 for how such funds shall be appropriated, consistent with the require-
40 ments of this section and section ninety-nine-nn of the state finance
41 law. Such recommendations shall be provided in a written report to the
42 governor, the temporary president of the senate, the speaker of the
43 assembly, the chair of the senate finance committee, the chair of the
44 assembly ways and means committee, the chair of the senate alcoholism
45 and substance abuse committee and the chair of the assembly alcoholism
46 and drug abuse committee.
47    10. On or before November first of each year, beginning one year after
48 the initial deposit of monies in the opioid settlement fund, the rele-
49 vant commissioners, in consultation with the advisory board, shall
50 provide a written report to the governor, temporary president of the
51 senate, speaker of the assembly, chair of the senate finance committee,
52 chair of the assembly ways and means committee, chair of the senate
53 alcoholism and substance abuse committee and chair of the assembly alco-
54 holism and drug abuse committee. Such report shall be presented as a
55 consolidated dashboard and be made publicly available on the respective
56 offices' websites. The report shall include the following information:

1  (i) the baseline funding for any entity that receives funding from the
2  opioid settlement fund, prior to the receipt of such opioid settlement
3  funds; (ii) how funds deposited in the opioid settlement fund had been
4  utilized in the preceding calendar year, including but not limited to:
5  (A) the amount of money disbursed from the fund and the award process
6  used for such disbursement, if applicable; (B) the names of the recipi-
7  ents, the amounts awarded to such recipient and details about the
8  purpose such funds were awarded for, including what specific services
9  and programs the funds were used on and what populations such services
10 or programs served; (C) the main criteria utilized to determine the
11 award, including how the program or service assists to reduce the
12 effects of substance use disorders; (D) an analysis of the effectiveness
13 of the services and/or programs that received opioid settlement funding
14 in their efforts to reduce the effects of the overdose and substance use
15 disorder epidemic. Such analysis shall utilize evidence-based uniform
16 metrics when reviewing the effects the service and/or program had on
17 prevention, harm reduction, treatment, and recovery advancements; (E)
18 any relevant information provided by the New York subdivisions pursuant
19 to this section; and (F) any other information the commissioner deems
20 necessary for the legislature to determine appropriate future awards and
21 ensure such funding is not being used to supplant local, state, or
22 federal funding.
23   (d) Limitation on authority of government entities to bring lawsuits.
24 No government entity shall have the authority to assert released claims
25 against entities released by the department of law in a statewide opioid
26 settlement agreement executed by the department of law and the released
27 party on or after June first, two thousand twenty-one. Any action filed
28 by a government entity after June thirtieth, two thousand nineteen
29 asserting released claims against a manufacturer, distributor, or
30 dispenser of opioid products shall be extinguished by operation of law
31 upon being released by the department of law in such statewide opioid
32 settlement agreement.
33   § 3. Section 19.07 of the mental hygiene law is amended  by  adding  a
34 new subdivision (n) to read as follows:
35   (n) The office in consultation with the office of mental health, the
36 department of health, the division of housing and community renewal and
37 any other agency that may oversee an appropriate program or service
38 shall monitor and ensure funds appropriated pursuant to section ninety-
39 nine-nn of the state finance law are expended for services and programs
40 in accordance with such section.
41   § 4. Paragraph (b) of subdivision 16 of section 63  of  the  executive
42 law, as added by section 4 of part HH of chapter 55 of the laws of 2014,
43 is amended to read as follows:
44   (b) Paragraph (a) of this subdivision shall not apply to any provision
45 in  the  resolution of a claim or cause of action providing (1) moneys to
46 be distributed to the federal government, to a local government,  or  to
47 any  holder  of a bond or other debt instrument issued by the state, any
48 public authority, or any public benefit corporation; (2)  moneys  to  be
49 distributed solely or exclusively as a payment of damages or restitution
50 to  individuals  or entities that were specifically injured or harmed by
51 the defendant's or settling party's conduct and that are identified  in,
52 or  can  be  identified  by  the terms of, the relevant judgment, stipu-
53 lation, decree, agreement to settle,  assurance  of  discontinuance,  or
54 relevant  instrument  resolving the claim or cause of action; (3) moneys
55 recovered or obtained by the attorney general where application of para-
56 graph (a) of this subdivision is prohibited by  federal  law,  rule,  or

 1  regulation, or would result in the reduction or loss of federal funds or
 2  eligibility for federal benefits pursuant to federal law, rule, or regu-
 3  lation; (4)   moneys  recovered  or obtained by or on behalf of a public
 4  authority,  a public benefit corporation, the department of taxation and
 5  finance, the workers' compensation board,  the  New  York  state  higher
 6  education  services corporation, the tobacco settlement financing corpo-
 7  ration, a state or local retirement system, an employee  health  benefit
 8   program administered by the New York state department of civil service,
 9  the Title IV-D child support fund, the lottery prize fund, the abandoned
10  property fund, or an endowment of the state university of  New  York  or
11  any   unit   thereof  or any state agency, provided that all of the moneys
12  received or recovered are immediately transferred to the relevant public
13  authority, public benefit corporation,  department,  fund,  program,  or
14  endowment;  (5)  moneys to be refunded to an individual or entity as (i)
15  an overpayment of a tax, fine, penalty,  fee,  insurance  premium,  loan
16  payment, charge or surcharge; (ii) a return of seized assets; or (iii) a
17  payment made   in  error; [**and**] (6) moneys to be used to prevent, abate,
18  restore, mitigate or control any identifiable instance of prior or ongo-
19  ing water, land or air pollution**; and (7) moneys obtained as a result of**
20  **a settlement agreement which resulted from litigation with entities that**
21  **manufactured, sold, distributed, dispensed or promoted opioids made in**
22  **connection with claims arising from the manufacturing, marketing,**
23  **distributing, promoting or dispensing of opioids, as well as any funds**
24  **received by the state as a result of a judgment, stipulation, decree,**
25  **agreement to settle, assurance of discontinuance, or other legal instru-**
26  **ment resolving any claim or cause of action against manufacturers,**
27  **distributors, dispensers or vendors of opioids and related entities**
28  **arising out of activities alleged to have contributed to increases in**
29  **opioid addiction, whether filed or unfiled, actual or potential, and**
30  **whether arising under common law, equity, or any provision of law**.
31    § 5. Paragraph (b) of subdivision 11 of section 4 of the state finance
32  law, as added by section 1 of part HH of chapter 55 of the laws of 2014,
33  is amended to read as follows:
34    (b) Paragraph (a) of this subdivision shall not apply to (1) moneys to
35  be distributed to the federal government, to a local government,  or  to
36  any  holder  of a bond or other debt instrument issued by the state, any
37  public authority, or any benefit corporation; (2)  moneys  to  be
38  distributed solely or exclusively as a payment of damages or restitution
39  to  individuals  or entities that were specifically injured or harmed by
40  the defendant's or settling party's conduct and that are identified  in,
41  or  can  be identified by the terms of, the relevant judgment, agreement
42  to settle, assurance of discontinuance, or relevant instrument resolving
43  the claim or cause of action; (3) moneys recovered  or  obtained  by  a
44  state  agency  or  a state official or employee acting in their official
45  capacity where application of  paragraph  (a)  of  this  subdivision  is
46  prohibited  by  federal law, rule, or regulation, or would result in the
47  reduction or loss of federal funds or eligibility for  federal  benefits
48  pursuant  to  federal  law, rule, or regulation; (4) moneys recovered or
49  obtained by or on behalf of a public authority, a public benefit  corpo-
50  ration,  the  department  of  taxation and finance, the workers' compen-
51  sation board, the New York state higher education services  corporation,
52  the  tobacco  settlement financing corporation, a state or local retire-
53  ment system, an employee health benefit program administered by the  New
54  York  state  department  of  civil service, the Title IV-D child support
55  fund, the lottery prize fund, the abandoned property fund, or an  endow-
56  ment  of  the  state  university  of New York or any unit thereof or any

1   state agency, provided that all of the moneys received or recovered  are
2   immediately transferred to the relevant public authority, public benefit
3   corporation,  department,  fund, program, or endowment; (5) moneys to be
4   refunded  to  an  individual  or  entity as (i) an overpayment of a tax,
5   fine,  penalty,  fee,  insurance premium,  loan payment,  charge  or
6   surcharge;  (ii)  a  return of seized assets, or (iii) a payment made in
7   error;  [**and**] (6) moneys to be used to prevent, abate, restore, mitigate,
8   or control any identifiable instance of prior or ongoing water, land  or
9   air  pollution; **and (7) moneys obtained as a result of a settlement**
10  **agreement which resulted from litigation with entities that manufac-**
11  **tured, sold, distributed, dispensed or promoted opioids made in**
12  **connection with claims arising from the manufacturing, marketing,**
13  **distributing, promoting or dispensing of opioids, as well as any funds**
14  **received by the state as a result of a judgment, stipulation, decree,**
15  **agreement to settle, assurance of discontinuance, or other legal instru-**
16  **ment resolving any claim or cause of action against manufacturers,**
17  **distributors, dispensers or vendors of opioids and related entities**
18  **arising out of activities alleged to have contributed to increases in**
19  **opioid addiction, whether filed or unfiled, actual or potential, and**
20  **whether arising under common law, equity, or any provision of law**.
21    § 6. This act shall take effect immediately.