UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

TOWN OF BABYLON, NY, et al.,

           *Plaintiffs,*

    -against-

LETITIA JAMES, in her official capacity
as the Attorney General for the State
of New York,

           *Defendant.*

-------------------------------------X

**MEMORANDUM AND ORDER**

22-CV-1681(KAM)(AYS)

**KIYO A. MATSUMOTO, United States District Judge:**

    Plaintiffs Town of Babylon, NY; Town of Brookhaven, NY; Town of Hempstead, NY; Town of Islip, NY; Town of Oyster Bay, NY; Town of North Hempstead, NY; Town of Huntington, NY; Town of Ramapo, NY; and the Town of Smithtown, NY (collectively, the "Plaintiffs") commenced the instant action against Letitia James in her official capacity as Attorney General for the State of New York ("Defendant"), seeking declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. (ECF No. 1). Plaintiffs allege that New York Mental Hygiene Law § 25.18(d) (the "challenged statute") violates their rights to substantive due process, equal protection, and access to the courts under the U.S. and New York Constitutions and violates the home-rule restrictions under Article IX of the New York Constitution.

1

Presently before the Court is Defendant's motion to dismiss the Fourth Amended Complaint ("FAC"), pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). (*See* ECF No. 48, Defendant's Notice of Motion to Dismiss.) For the reasons set forth below, Defendant's motion is **GRANTED**.

## BACKGROUND

The Court accepts the allegations in the Plaintiffs' Fourth Amended Complaint as true for purposes of the Motion to Dismiss. *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

### I. Factual Background

Plaintiffs in this case are incorporated towns in New York that had previously commenced actions against the producers and distributors of opioid drugs. (ECF No. 45, FAC at ¶¶1-2.) Plaintiffs brought their claims seeking "money damages for the financial losses they had suffered as a consequence of the producers' and distributors' wrongdoing." (*Id.* at ¶4.) Specifically, Plaintiffs allege that, as a result of the opioid crisis in their communities, they were "forced to devote their scare resources to [respond] to the crisis, which inevitably came at the expense of other priorities, such as preparations for other emergencies and replacements for aging fleets of EMS response vehicles and ambulances." (*Id.* at ¶3.)

Plaintiffs provide some background on the opioid epidemic in their complaint, alleging that opioid producers and distributors generated "billions of dollars in revenue" while creating a public health catastrophe that resulted in "nearly two million Americans [] either abusing opioids or dependent on them" by 2014. (*Id.* at ¶¶26-27.) This epidemic, the Plaintiffs allege, has had a "devast[ating] effect on towns and villages throughout New York, including the towns that are Plaintiffs in this action." (*Id.* at ¶29.) Citing the Town of Brookhaven as an example, Plaintiffs represent that the town's contracted emergency medical services provider, Brookhaven Ambulance Company, has had to "delay[] replacement of first emergency response utility vehicles" and ambulances as a result of the diversion of money to respond to the opioid crisis. (*Id.* at ¶¶31-36.)

Plaintiffs in this case filed their state court complaint in New York State Supreme Court for Suffolk County on December 10, 2019, naming "multiple defendants involved in the production and distribution of opiate drugs" and "seeking to hold [those] defendants responsible for the financial harm Plaintiffs had suffered as a result of the opioid crisis." (*Id.* at ¶37.) Plaintiffs note that the State of New York, as well as Nassau and Suffolk Counties, among other entities, also brought similar claims "against the same producer and distributor defendants." (*Id.* at ¶39.) Subsequently, the State of New York entered into

settlement negotiations with "certain distributor defendants and producer defendants," and a bill ("Senate Bill 7194" of the 2021 Regular Session) was introduced in the New York Senate to "facilitate the settlement discussions that were then underway." (*Id.* at ¶¶42-43.)

According to the Plaintiffs, Senate Bill 7194 "contemplated the creation of an opioid settlement fund administered by the State" and "also purported to extinguish some—but not all—of the claims by State 'subdivisions' including 'each county, city, town, village, or special district in the state of New York.'" (*Id.* at ¶43.) Specifically, the bill retroactively "operated to extinguish" claims that had been filed after June 30, 2019, including those filed by Plaintiffs. (*Id.* at ¶¶44-46.) Senate Bill 7194 was signed into effect on June 29, 2021 (including Section 25.18(d) of the New York Mental Hygiene Law, in relevant part). (*Id.* at ¶47; ECF No. 50, Declaration of Andrew Amer ("Amer Decl."), at ¶3.) Section 25.18(d) prohibited any "governmental entity" from asserting "released claims against entities released by the [Office of the Attorney General] in a statewide opioid settlement agreement" on or after June 1, 2021, and extinguished claims filed after June 30, 2019, and prior to June 1, 2021. (FAC at ¶44, Amer Decl. at ¶3.)

Plaintiffs allege that the State of New York, along with Nassau and Suffolk Counties, subsequently "entered into a

settlement with three distributor defendants" which included "settlements in cash" for Nassau and Suffolk Counties. (FAC at ¶47.) Plaintiffs allege that Nassau and Suffolk Counties, having filed their claims prior to June 30, 2019, were able to participate directly in the settlement and "received settlements in cash, with no restriction on their use of the funds they received." (*Id.*) Because Plaintiffs' claims were filed after the June 30, 2019, cutoff set in Section 25.18(d), Plaintiffs allege that they were left "with no recovery from the producer and distributor defendants for the financial harm they have suffered as a result of those defendants' misconduct." (*Id.* at ¶48.) Plaintiffs allege that the June 30, 2019, cutoff for the extinguishment of claims was "arbitrary" and "advantaged Suffolk County and Nassau County . . . at the expense of the towns and villages that stand on the front line in the opioid crisis." (*Id.* at ¶¶6-7.)

## II. Procedural History

Plaintiffs commenced the instant case on March 25, 2022, initially asserting claims arising under 42 U.S.C. § 1983 and the New York State Constitution. (*See* ECF No. 1, Complaint, at ¶¶34-43.) Plaintiffs subsequently filed a First Amended Complaint on March 29, 2022, correcting a misnomer in the Defendant's name in the original complaint and adding a fourth cause of action based on the 14th Amendment. (*See generally* ECF No. 9.) Plaintiffs amended their complaint for a second time on April 6, 2022, adding

5

additional factual detail, among other things. (*See generally* ECF No. 16, Second Amended Complaint ("SAC").) Defendant consented to the entry of the SAC, (*see* ECF No. 18), and requested a pre-motion conference to discuss a planned motion to dismiss on April 7, 2022, (*see* ECF No. 17), which the Court granted.

In response, Plaintiffs sought Defendant's consent to further amend their complaint, which Defendant granted, (ECF No. 20), and subsequently filed a Third Amended Complaint ("TAC") on April 12, 2022, (ECF No. 21, TAC). The TAC was a significant revision, removing the Section 1983 claim and instead seeking declaratory relief and a permanent injunction, albeit under similar legal theories. (*See generally* TAC.) Defendant subsequently requested a pre-motion conference regarding a motion to dismiss on April 18, 2022, (ECF No. 22), and Plaintiffs requested a pre-motion conference to discuss filing an emergency motion for a temporary restraining order on May 2, 2022, (ECF No. 24). The Court discussed both planned motions during a May 3, 2022, hearing, and ordered that briefing would proceed on the motion to dismiss first, and subsequently the motion for injunctive relief would be considered after adjudicating the motion to dismiss. (Minute Entry dated May 3, 2022.)

After the motion to dismiss was fully briefed, on August 5, 2022, Defendant submitted a letter request for oral argument on the Motion to Dismiss, which Plaintiffs joined. (ECF No. 37; ECF

No. 39.) The Court granted the request, and subsequently held oral argument in the instant case on February 23, 2023. (Minute Entry dated February 23, 2023.) Based on the parties' filings and the oral argument made, the Court granted the Defendant's motion to dismiss without prejudice, due to Plaintiffs' lack of legal capacity to bring the action. (*Id.*) The Court granted Plaintiffs leave to file a Fourth Amended Complaint addressing the deficiencies by March 9, 2023. (*Id.*)

Plaintiffs filed their Fourth Amended Complaint on March 9, 2023, (*see generally* FAC), and Defendant responded by requesting to proceed with motion practice to dismiss the action, (ECF No. 46). The Court subsequently set a briefing schedule, and the motion to dismiss was fully briefed on May 31, 2023. (*See* ECF No. 48, Defendant's Notice of Motion; ECF No. 49, Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Def't Mem."); ECF No. 50, Amer Decl.; ECF No. 52, Plaintiffs' Memorandum of Law in Opposition ("Pl. Opp."); ECF No. 54, Defendant's Reply Memorandum of Law in Further Support of its Motion to Dismiss ("Def't Reply").)

## **LEGAL STANDARD**

### I. **Motion to Dismiss under Rule 12(b)(1)**

Federal courts have inherent power under Rule 12(b)(1) to dismiss claims for which subject matter jurisdiction is lacking. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.

2008), *aff'd*, 561 U.S. 247 (2010).  In considering a motion to dismiss under Rule 12(b)(1), the "[C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff."  *Id.* (internal quotation marks and citation omitted).  The Court may also "consider evidence outside the pleadings."  *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000)).

"An objection to standing is properly made on a Rule 12(b)(1) motion."  *Tasini v. N.Y. Times Co.*, 184 F. Supp. 2d 350, 354-55 (S.D.N.Y. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)).  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To survive a Rule 12(b)(1) motion to dismiss, there must be facts plausibly establishing that the plaintiff has standing to sue.  *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

## II.  Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed factual allegations" are not required, "[a] pleading that offers labels or conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1) . . . as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first." *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993) (internal quotation marks and citation omitted). Accordingly, the Court first addresses Defendants' Rule 12(b)(1) arguments, followed by their Rule 12(b)(6) arguments.

### I.    The Capacity-to-Sue Rule

#### a. Legal Standard

"Legal capacity is governed by Federal Rule of Civil Procedure 17(b)." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 136 (E.D.N.Y. 2013), *aff'd*, 868 F.3d 104 (2d Cir. 2017). As such, "[p]ursuant to Fed. R. Civ. P. 17(b), the capacity of a governmental entity to sue or be sued is a question of state law." *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995). "Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question

of standing." *LBBW Luxemburg S.A. v. Wells Fargo Sec., LLC*, 744 F. App'x 710, 714 n.3 (2d Cir. 2018) (summary order) (quoting 59 Am. Jur. 2d Parties § 26). Although "[c]apacity, unlike standing, is ordinarily not a jurisdictional issue . . . a party must maintain its capacity to sue throughout litigation, and lack of capacity is grounds for dismissal." *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019) (internal quotation marks and citations omitted).

New York follows the traditional capacity-to-sue rule, which states that "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. State of New York*, 655 N.E.2d 649, 651 (N.Y. 1995) (hereafter "*City of New York*"). Such entities are "purely creatures or agents of the State," and so "cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants." *Id.* In other words, "political power conferred by the Legislature confers no vested right as against the government itself." *Id.* (quoting *Black River Regulating Dist. v. Adirondack League Club*, 121 N.E.2d 428, 433 (N.Y. 1954)). The New York capacity-to-sue rule is also a "necessary outgrowth of separation of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature,

the State and its governmental subdivisions." *City of New York*, 655 N.E.2d at 654.

"The New York Court of Appeals has recognized four exceptions to this general rule: (1) where a public corporation has express statutory authorization to bring suit; (2) where the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; (3) where the statute impinges upon 'Home Rule' powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution; and (4) where the public corporation asserts that, if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63–64 (2d Cir. 2017) (citing *City of New York*, 655 N.E.2d at 652). The New York Court of Appeals has emphasized "that the exceptions we have recognized to date are narrow." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 89 N.E.3d 1227, 1234 (N.Y. 2017) (hereafter "*Matter of WTC*"). Specifically, the New York Court of Appeals has explained that under the general rule, it had "barred public entities from challenging a wide variety of state actions, such as, e.g., the allocation of state funds amongst various localities." *Id.* (citing *City of New York*).

### b. Analysis

Both Plaintiffs and Defendant agree that only two of the four exceptions to the general rule barring constitutional challenges by political subdivisions could potentially apply in the present case. (Def't Mem. at 13; Pl. Opp at 11.) The second exception, the proprietary interest exception, may apply where a public entity is "'vested with an entitlement to a specific fund by a statute' and the challenged statute adversely affects its interest in the fund." *Matter of WTC*, 89 N.E.3d at 1233 (quoting *Town of Moreau v. Saratoga County*, 531 N.Y.S.2d 61, 62 (3d Dep't 1988)). The third exception, the home rule exception, may apply where a state statute impinges on a municipality's home rule powers under the State Constitution. *Matter of WTC*, 89 N.E.3d at 1233 (citing *Town of Black Brook v. State*, 362 N.E.2d 579 (N.Y. 1977)). The Court will consider the applicability of each exception in turn.

### i. Proprietary Interest Exception

Defendants argue, and the Court agrees, that the proprietary interest exception does not apply to the instant case. As noted by the Second Circuit, "[t]wo cases serve as helpful guideposts in assessing the applicability of the [proprietary interest] exception." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 892 F.3d 108, 111 (2d Cir. 2018). The Second Circuit summarized those two cases as follows:

In the first, *Gulotta v. State*, three New York counties and their county executives brought an action challenging "the system of State mandates," which consisted of "various laws which require[d] the [c]ounties to make expenditures." 645 N.Y.S.2d 41, 42 (2d Dep't 1996). The New York Supreme Court ruled that the plaintiffs had the capacity to sue, but the Appellate Division disagreed. *Id.* The Appellate Division recognized that "municipalities and other local governmental corporate entities and their officers lack the capacity to mount constitutional challenges" to state legislation, and expressly held—despite the fact that the laws at issue required county expenditures—that the proprietary-interest exception did not apply. *Id.* at 42–43. In "stress[ing]" the narrowness of the exceptions to the capacity-to-sue rule in *Matter of World Trade Center*, the New York Court of Appeals cited that holding as authoritative. 89 N.E.3d 1227, 1234.

The second case . . . is *County of Rensselaer v. Regan*, 607 N.E.2d 793 (N.Y. 1992). In 1981, the New York State Legislature enacted the "'special traffic options program for driving while intoxicated' (STOP-DWI) whereby a participating county could receive fines and forfeitures collected by courts within that county for alcohol-related driving offenses." *Id.* at 794. A decade later, the Legislature passed another law that diverted to the state a percentage of the drunk driving funds to which participating counties were entitled. *Id.* The plaintiff counties brought a constitutional challenge to the new law, and the New York Court of Appeals held that their challenge could be heard because, "STOP-DWI legislation having been neither amended nor repealed, the participating counties ha[d] a proprietary claim to the fines and forfeitures" to which the later legislation was directed. *Id.* at 795.

*Id.* at 111–12 (state reporter citations omitted).

Ignoring the requirements that the public entity be "vested with an entitlement to a specific fund by statute," *Matter of WTC*, 89 N.E.3d at 1233, Plaintiffs argue that their potential recovery of damages from their opioid lawsuits is akin to the "*potential*

revenue generated by the STOP-DWI program" in *County of Rensselaer*, (Pl. Opp. at 13). Continuing, Plaintiffs argue that "[b]oth here and in *County of Rensselaer*, the State's legislation sought to capture prospective revenue to be garnered through litigation that otherwise would have been kept by the political subdivisions." (*Id.*)

Defendant appropriately distinguishes the instant case from *County of Rensselaer*, noting that "unlike in *Rensselaer,* there is no statute granting Plaintiffs the right to receive any specific funds; rather, Plaintiffs had only unadjudicated legal claims asserted against opioid defendants that may or may not have resulted in a monetary recovery." (Def't Reply at 3.) Continuing, Defendant notes that "[a]lthough the specific amount of the funds to be received by each county in any year in [*County of*] *Rensselaer* was uncertain until such time as the fines and forfeitures were collected, each participating county had a proprietary interest in these 'discrete funds' specifically designated for its use by statute." (*Id.*)

The Court finds Defendant's arguments persuasive. As noted by the Appellate Division in a case cited by the Court of Appeals approvingly in *Matter of WTC*, "[m]erely asserting a claim to a particular sum of money does not, however, create the proprietary interest needed for standing." *Town of Moreau v. Saratoga County*, 531 N.Y.S.2d 61, 62 (3d Dep't 1988). Rather, in previous cases

14

where the exception was utilized, the "public entity [was] vested with an *entitlement to a specific fund by a statute* and the challenged statute adversely affect[ed] its interest in the fund." *Matter of WTC*, 89 N.E.3d at 1233 (emphasis added) (internal quotation marks and citation omitted). In particular, *County of Rensselaer* involved an "allegedly unconstitutional law [that] was aimed at specific funds to which the counties were otherwise entitled." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 892 F.3d 108, 112 (2d Cir. 2018).

Plaintiffs do not cite any persuasive authority that suggests they have a "vested" entitlement to a "specific fund" by statute, based on their pre-existing lawsuits against opioid producers and distributors, as required to satisfy the proprietary interest exception. While there may be similarities between the instant case and *County of Rensselaer*, there are also important differences. Both cases involve the proceeds of litigation, however, in the case of *County of Rensselaer*, the proceeds in *Rensselaer* were to be placed into a specific fund, created by statute, which would be available "for law enforcement and education purposes in accordance with plans submitted to and approved by the Commissioner of Motor Vehicles, who ha[ve] a continuing duty to monitor each county's program." *County of Rensselaer v. Regan*, 607 N.E.2d 793, 794 (N.Y. 1992). Specifically, the Special Traffic Options Program for Driving

15

While Intoxicated ("STOP-DWI") legislation established the fund and provided that "where a county establishes a [STOP-DWI program], pursuant to this section, it shall receive fines and forfeitures collected by any court, judge, magistrate, or other officers within that county from violations of [Vehicle and Traffic Law statutes, including operating a motor vehicle while under the influence of alcohol or drugs] . . . the county shall deposit them in a separate account entitled [STOP-DWI] and they shall be under the exclusive care, custody, and control of the chief fiscal officer of each county participating in this program." Alcohol and Drug-Related Provisions of Vehicle and Traffic Law-Recodification, 1988 N.Y. Sess. Law Serv. 47.[1]

The STOP-DWI legislation which created the fund at issue in *County of Rensselaer* did not create a cause of action which political subdivisions could bring "in their proprietary capacities to protect the same kinds of pecuniary interests that a plaintiff has," as Plaintiffs argue was the case with their extinguished claims against opioid distributors and producers. (Pl. Opp. at 14.) Rather, the STOP-DWI legislation designated fines and forfeitures received from the prosecution of traffic infractions into a specific fund exclusively for the use of each participating county. *County of Rensselaer*, 607 N.E.2d at 794.

---

[1] The Court cites to the 1988 version of the law which was in force at the time of *County of Rensselaer*. 607 N.E.2d at 794.

The Court of Appeals found that the STOP-DWI legislation was sufficient to grant the participating counties a "proprietary claim to the fines and forfeitures at issue." *Id.* at 795.

In the instant case, Plaintiffs' extinguished claims in state court were "based on the fact that the producer and distributor defendants, through conduct that was negligent and that also violated various statutory provisions, had caused Plaintiffs tremendous financial harm." (FAC at ¶38.) As such, there is a clear difference between the challenged legislation in *County of Rensselaer*, which affected the plaintiff political subdivision's proprietary rights to a statutorily created fund, and the law in the instant case, which affected Plaintiffs' rights to continue lawsuits involving certain claims "against a manufacturer, distributor, or dispenser of opioid products." N.Y. Mental Hyg. Law § 25.18(d). Though the challenged statute in the instant case may affect the Plaintiffs' "vested rights," Plaintiffs do not show that they are "vested with an entitlement to a specific fund by a statute." *Matter of WTC*, 89 N.E.3d at 1233. As such, Plaintiffs' claims against the state are not subject to the proprietary interest exception.[2]

---

[2] Though there is a general presumption against statutory retroactivity in situations involving vested rights, the Court also notes that the Supreme Court has stated that "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its

### ii. Home Rule Exception

Under the home rule exception, when "a local government's claim is based on one of the protections of article IX [of the New York State Constitution], the principle underlying the otherwise general rule prohibiting it from questioning legislative action affecting its powers is no longer applicable." *Town of Black Brook v. State*, 362 N.E.2d 579, 580–81 (N.Y. 1977). Specifically, the exception applies in a situation "where a state statute impinges on a municipality's home rule powers under the State Constitution." *Matter of WTC*, 89 N.E.3d at 1233. The New York Court of Appeals summarized the protections of Article IX of the New York State constitution as follows:

> Article IX, § 2 of the State Constitution grants the Legislature authority to enact a "general law" relating to the property, affairs or government of local governments (N.Y. Const, art. IX, § 2[b][2]). A general law is defined as a "law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages" (N.Y. Const., art IX, § 3[d][1]). In contrast, a "special law" is defined as a "law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages" (N.Y. Const., art. IX, § 3[d][4]). Article IX further provides that a special law relating to the property, affairs or government of any local government may not be enacted without a "home rule message" from the locality or the localities affected by the law (N.Y. Const., art. IX, § 2[b][2]). A home rule message is a "request of two-thirds of the total membership of [the local]

---

passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 267–68 (1994). Further, the Court notes that such a question may only be reached if a party has the capacity and standing to challenge the retroactive statute in question.

> legislative body or . . . [a] request of its chief
> executive officer concurred in by a majority of such
> membership" (*id.*).

*Patrolmen's Benevolent Ass'n of City of New York Inc. v. City of New York*, 767 N.E.2d 116, 120 (N.Y. 2001) (hereafter "*PBA II*").

The parties both interpret Section 25.18(d) of the Mental Hygiene Law as a "special law" under Article IX of the New York State Constitution. (Def't Mem. at 14; Pl. Opp. at 14.) This follows from the logic of *PBA II,* where a law with statewide applicability had the "actual effect" of being a "restriction targeted at [only] four localities," and thus was classified as a "special law." *PBA II*, 767 N.E.2d at 121. Defendant argues, however, that legislation which "'was enacted in furtherance of and bears a reasonable relationship to a substantial State-wide concern' is not subject to home-rule restrictions, even if the legislation simultaneously relates to the property, affairs or government of a local government." (Def't Mem. at 14 (citing *PBA II*, 767 N.E.2d at 121).) Plaintiffs disagree that the challenged statute was enacted in furtherance of a substantial state-wide concern, arguing that because Nassau and Suffolk Counties were allowed "to participate directly in the settlement . . . the statute, as a matter of law, cannot be deemed to be solely for the State's benefit." (Pl. Opp. at 14-15 (citing *City*

*of New York v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 676 N.E.2d 847, 848 (N.Y. 1996) (hereafter "*PBA I*")).)

The case cited by Plaintiffs, *PBA I,* concerned a law which sought to achieve "State-wide uniformity with respect to impasse procedures available to police department members under Civil Service Law § 209 . . . [but] isolated New York [City] for different treatment and thus failed in its goal to achieve uniformity in the [Civil Service law's] treatment of police." *PBA II*, 767 N.E.2d at 122 (describing the law at issue in *PBA I*). Although that version of the law was found not to be "enacted in compliance with the home rule requirements of the State Constitution," a subsequent amended version of the law "correct[ed] the infirmities of its predecessor statute by not targeting one locality and uniformly applying to all local governments, by expressly stating the substantial State concern sought to be addressed and by ensuring that the legislation is rationally related to that concern." *Id.*

Defendant argues, and the Court agrees, that the challenged bipartisan statute in the instant case bears "a reasonable relationship to a substantial State-wide concern," to address the devastating impact of the opioid crisis in New York by establishing an opioid settlement fund. (Def't Mem. at 15 (citing *PBA II*, 767 N.E.2d at 121).) In determining whether a substantial State concern is present, courts "rel[y] upon the stated purpose and legislative history of the act in question." *PBA I*, 676 N.E.2d at

852.  The Court of Appeals has further noted that the "wisdom of that determination is not for court review," although the "fulfillment of th[e] legislative purpose" should be "rationally served" by the legislation in question.  *PBA II,* 767 N.E.2d at 122 (internal quotation marks and citation omitted).

As noted by Defendant, the Sponsors Memorandum for Senate Bill 7194[3] (the bill which included Section 25.18(d), as noted *supra*) stated plainly that the purpose for the bill was to "establish an opioid settlement fund and advisory board to insure that any settlement monies are dedicated towards substance use disorder prevention, treatment and recovery."  New York Sponsors Memorandum, 2021 S.B. 7194.  The Sponsors Memorandum also included further justification for the creation of a dedicated opioid settlement fund, noting the fact that much of the money from the tobacco settlements of the 1990s was ultimately used "to pay for an array of programs and services unrelated to the harms of tobacco use."  *Id.*  As such, the sponsor of the bill argued that "[a]ny money obtained from these lawsuits [against manufacturers and distributors of opioids] must be used to address the harms caused by drug use and by the ways in which drug laws have been enforced."  *Id.*  In furtherance of that purpose, the law "creates a secure

---

[3] The Court takes judicial notice of the legislative materials in question.  The Second Circuit has held that "as a fundamental matter, courts may take judicial notice of legislative history."  *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022), *cert. denied sub nom. Goe v. McDonald*, 143 S. Ct. 1020 (2023).

fund for any opioid settlement funds the state receives and [a] board to oversee the fund allocations" and further "ensures that dollars received in any settlement are used for the intended and right purposes." *Id.* The purpose and justification of the bill is echoed in the text of the statutes, as well, which expressly defines the "Opioid settlement fund" as having a purpose of "preventing addiction and reducing the harms caused by the overdose and substance use disorder epidemic consistent with the terms of any statewide opioid settlement agreement." N.Y. Mental Hyg. Law § 25.18.

Furthermore, the fact that the challenged statute does not apply equally across *all* localities (specifically Nassau and Suffolk counties), as noted by Plaintiffs, does not prevent it from addressing a "substantial State-wide concern." As stated by the New York Court of Appeals, "[a] great deal of legislation relates *both* to the property, affairs or government of a local government and to matters other than the property, affairs or government of a local government—i.e., to matters of substantial state concern." *Empire State Chapter of Associated Builders & Contractors, Inc. v. Smith*, 992 N.E.2d 1067, 1071 (N.Y. 2013) (internal quotation marks omitted). As such, the home rule provisions, which "were intended to prevent unjustifiable state interference in matters of purely local concern," are not triggered by legislation that "do[es] not treat all counties alike, [as long

as it] unquestionably affect[s] the state as a whole." *Id.* at 1071-73.

Accordingly, the Court agrees with the parties that Senate Bill 7194 is a special law, and finds that the statute did not trigger the home rule procedural requirements because it "was enacted in furtherance of and bears a reasonable relationship to a substantial State-wide concern." *PBA II*, 767 N.E.2d at 121. In light of this finding, the home rule exception to the general rule barring constitutional challenges by political subdivisions does not apply. Because this Court has found that neither exception to the rule barring public entities from suits challenging state actions as unconstitutional applies to Plaintiffs in the instant case, Plaintiffs lack capacity under New York state law to bring this action, and this court thus lacks jurisdiction to hear any dispute.

## II. Standing

### a. Legal Standard

Even if Plaintiffs did not lack the capacity to bring this action challenging state action, "Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citation omitted). "The irreducible constitutional minimum of standing derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial

power to cases and controversies." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) (internal quotation marks and citations omitted).  To establish Article III standing, a plaintiff must show "(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).  At the pleading stage, a plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest that [he or she] has standing to sue." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (internal quotation marks and citation omitted).

### b. Analysis

The Second Circuit has clearly held that "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973); *see also Aguayo v. Richardson*, 473 F.2d 1090, 1101 (2d Cir. 1973) ("[t]he City lacks standing to assert constitutional claims against the State").  This rule is premised on the Supreme Court's decision in *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40 (1933), which held that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities

under the Federal Constitution which it may invoke in opposition to the will of its creator." The Second Circuit has since clarified that "a subdivision may sue its state under the Supremacy Clause," joining the 5th and 10th Circuits in its holding. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019). The Second Circuit did not abrogate their previous decisions in reaching their decision in *Tweed,* however, noting that *City of New York v. Richardson* and *Aguayo* "present[] considerations different from those we consider here." *Id.* at 73 n.7. Rather, the Second Circuit noted that the Supremacy Clause "raises unique federalism concerns" not addressed by *Williams* or other Supreme Court cases relied upon by the Second Circuit in *City of New York v. Richardson*. *Id.* at 73.

Plaintiffs' complaint does not state a cause of action arising under the Supremacy Clause. (*See generally* FAC). Furthermore, Plaintiffs do not cite any controlling authority that directly contradicts *City of New York v. Richardson* or otherwise holds that a political subdivision has standing to bring suit against its parent state under the Fourteenth Amendment.[4] Where the Second

_____

[4] Plaintiffs cite to *Romer v. Evans*, 517 U.S. 620, 625 (1996) and *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 464 (1982), noting that the two cases were cited in Tweed for the proposition that "the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." *Tweed-New Haven Airport Auth.*, 930 F.3d at 73. However, as noted by Defendants, in both cases "the plaintiffs included entities that were *not* political subdivisions, so the question of legal [standing] to maintain the suit was not dispositive and, therefore, apparently was not raised or addressed." (Def't Reply at 7.) Plaintiffs in the instant case consist

25

Circuit has "spoken directly to the issue presented," this Court must follow its decision unless it is "overruled in a precedential opinion by the Second Circuit itself," or later Supreme Court precedent "so undermines it that it will almost inevitably be overruled by the Second Circuit." *United States v. Smith*, 489 F. Supp. 3d 167, 172–73 (E.D.N.Y. 2020). Here, in light of the Second Circuit's decision in *City of New York v. Richardson*, and a lack of later Second Circuit or Supreme Court jurisprudence undermining that decision, this Court must conclude that Plaintiffs lack standing to pursue their claims under the Fourteenth Amendment.

Plaintiffs' argument that they are able to evade the Second Circuit's holding in *City of New York v. Richardson* by bringing this suit in their "proprietary capacity" against the state is likewise without merit. Plaintiffs do not cite to any authority that differentiates between a political subdivision suing its parent state in its "proprietary capacity" as opposed to its "governmental capacity." The primary authority cited by Plaintiffs for this proposition is *Owen v. City of Independence, Mo.*, 445 U.S. 622, 644-46 (1980), which dealt primarily with the extent to which a municipal corporation enjoyed protection from tort liability. Plaintiffs attempt to connect this line of case law to the instant case by citing a decision from the Southern

solely of political subdivisions of New York state, so this court does not find the cited cases supportive of their standing argument.

District of New York, which mused that "whether the rule barring municipalities from bringing Fourteenth Amendment claims against one another would apply to a municipal corporation bringing a challenge in its proprietary—not its governmental—capacity" would be an "interesting question." *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 364-65 (S.D.N.Y. 2000). The court's statement was referring to a decision from the Sixth Circuit which had concluded that "a municipality may not assert a substantive claim for protection of its rights [under the Fourteenth Amendment] against any other municipality or state political subdivision." *Id.* (citing *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 505 (6th Cir. 1986)).

Though the question discussed by the court in *City of New Rochelle* might be an "interesting" one, it is of no moment here. The instant case involves political subdivisions challenging legislation passed by their parent state under the Fourteenth Amendment, as opposed to a municipality bringing a Fourteenth Amendment action against another political subdivision, potentially in a "proprietary" capacity. Furthermore, although Plaintiffs argue that "[t]here is nothing distinctly 'governmental' about the claims the [Plaintiffs] brought against the opioid producer and distributor defendants," (Pl. Opp at 22), their claimed harm in the underlying cases arose out of

expenditures for "emergency medical services ('EMS'), fire departments, and police departments operated by towns and villages," (FAC at ¶30.), which are traditional governmental functions, *see Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 25 (2d Cir. 1979). As such, this Court finds it unnecessary to conduct any further analysis of the question posed by the non-controlling decision in *City of New Rochelle,* finding its analysis inapplicable to the instant case. Plaintiffs lack standing to bring a Fourteenth Amendment action[5] against New York and its Attorney General under binding Second Circuit precedent, and thus this Court lacks jurisdiction to hear their claims. *City of New York v. Richardson,* 473 F.2d at 929.

## III. State Constitutional Claims

### a. Legal Standard

When a district court has original jurisdiction over claims in a case, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III." *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (citing 28 U.S.C.

---

[5] The Court notes that while Plaintiffs also make claims regarding violations of their First Amendment rights by New York, those claims arise under the Fourteenth Amendment, given they allege action by the state and not the federal government. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 276-77 (1964); *see also Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023) ("the Supreme Court has held that the Fourteenth Amendment incorporates the protections of the First Amendment against state governments").

§ 1367(a)); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) ("Pendent jurisdiction . . . exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority,' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" (quoting U.S. Const. art. III, § 2)). Claims are considered "'part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)).

"[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Id.* at 122 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Although it is not mandatory to decline supplemental jurisdiction, "the Supreme Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

under the pendant jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward declining jurisdiction over the remaining state-law claims.'" *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *Cohill*, 484 U.S. at 350 n.7).

### b. Analysis

Notwithstanding the Court's finding regarding Plaintiffs' lack of capacity to bring this case, this Court has also found that Plaintiffs lack standing to pursue their claims based on the Fourteenth Amendment to the U.S. Constitution, and as such, this Court does not have subject matter jurisdiction to hear those claims. Plaintiffs' remaining claims arise under the Constitution of the State of New York, and therefore this Court must examine whether there is any other basis for this Court to exercise jurisdiction over the remaining claims.

The Court concludes that it cannot exercise diversity jurisdiction over this action, as there is a lack of diversity between the parties. Plaintiffs are political subdivisions of New York, and the Defendant is the Attorney General of New York, sued in her official capacity. (FAC at ¶¶10-20.) The Court concludes that, although supplemental jurisdiction could be exercised, as the state and federal claims "derive from a common nucleus of operative fact," such an exercise of jurisdiction "would not promote the values articulated in *United Mine Workers of America*

*v. Gibbs*" and thus, the exercise of supplemental jurisdiction should be declined. *See Shahriar*, 659 F.3d at 245.

Because this Court has "dismissed all claims over which it has original jurisdiction," it may properly "decline to exercise supplemental jurisdiction" pursuant to 28 U.S.C. § 1367(c). The Court has evaluated whether to exercise supplemental jurisdiction under the factors established in *United Mine Workers of America v. Gibbs*: economy, convenience, fairness, and comity. 383 U.S. at 726. All factors weigh in favor of the Court declining to exercise supplemental jurisdiction. Neither party has engaged in discovery in the instant case, which has not proceeded past the briefing of a motion to dismiss, favoring economy. Comity strongly favors declining to exercise supplemental jurisdiction in the instant case, given it involves a novel question of the constitutionality of a New York statute under the state constitution. This Court further finds that a state law forum would not be either inconvenient or unfair to either party. A New York state court would be well-equipped to examine unique questions of the constitutionality under state law[6], and Plaintiffs could bring a

---

[6] Though many of Plaintiffs' state law constitutional claims mirror provisions of the federal constitution, they would nonetheless be reviewed independently under state law. "Although State courts may not circumscribe rights guaranteed by the Federal Constitution, they may interpret their own law to supplement or expand them." *People v. P.J. Video, Inc.*, 501 N.E.2d 556, 560 (N.Y. 1986). When "there is no material textual difference between the relevant constitutional provisions," the reviewing state court will "conduct a 'noninterpretive' review of the constitutional provisions." *In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 830 N.E.2d 1118, 1123 (N.Y. 2005).

similar action challenging the constitutionality of the state's actions under the state constitution, to the extent a New York court found they had capacity to sue. *See, e.g., Town of Brookhaven v. State*, 535 N.Y.S.2d 773, 774-75 (3d Dep't 1988) (holding that, in a case where plaintiffs, including towns, challenged the constitutionality of laws regarding apportionment of state aid to localities, "a declaratory judgment action is the proper procedural vehicle to accomplish that challenge"). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## IV. The Declaratory Judgment Act

### a. Legal Standard

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201 provides in relevant part that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." § 2201(a).

### b. Analysis

Plaintiffs request this Court enter judgment pursuant to the DJA, declaring that Senate Bill 7194 is unconstitutional under various provisions of the New York and Federal constitutions. (*See generally FAC*.) Defendant, however, argues that Plaintiffs do not have a private right of action for their claims arising under the

Fourteenth Amendment to the Federal constitution, and therefore may not bring an action for a Declaratory Judgment premised on claims lacking a valid private right of action. (Def't Mem. at 18.)

The Second Circuit has held that, "[similar to] a preliminary injunction, a declaratory judgment relies on a valid legal predicate." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). Accordingly, the DJA is "procedural only, and does not create an independent cause of action." *Id.* (internal quotation marks and citations omitted). Consequently, where an underlying statute "does not provide that legal predicate, the DJA cannot expand the statute's authority by doing so." *Id.* at 245. Following this precedent, courts in this district have concluded that "[e]ven though the DJA provides that a court may grant a declaratory judgment even if no further relief could be sought, the precedent is clear; the DJA cannot create an individual right of action under [a statute] if one does not exist." *Magnoni v. Plainedge Union Free Sch. Dist.*, No. 17-cv-4043 (DRH), 2018 WL 4017585, at *7 (E.D.N.Y. Aug. 22, 2018).

Defendant argues that political subdivisions may not assert a private right of action pursuant to 42 U.S.C § 1983 based on Supreme Court precedent in *Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 712 (2003). This Court, however, need not reach the question

of whether the logic of *Inyo County* applies to the Plaintiffs in the instant case, given that they do not rely on Section 1983 to bring their claim. (*See generally* FAC). As such, and because this Court has already found that Plaintiffs lack standing to bring claims under the Fourteenth Amendment against their parent state, and this Court has declined to exercise supplemental jurisdiction over the state law claims, the Court further finds that Plaintiffs lack the necessary "legal predicate" to seek a declaratory judgment in the instant case.

## V. Failure to State a Claim

Having determined that the Plaintiffs' FAC must be dismissed for lack of subject matter jurisdiction, "the accompanying defenses and objections [by Defendant] become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Insurance Guaranty Association*, 896 F.2d 674, 678 (2d Cir. 1990). As a result, this Court declines to address Defendant's various arguments regarding the merits of Plaintiffs' constitutional and state law claims.

## CONCLUSION

For the forgoing reasons, Defendant's motion to dismiss the FAC is **granted** in its entirety. This Court lacks subject matter jurisdiction to hear Plaintiffs' claims, which are dismissed. In light of this Court's previous dismissal of Plaintiffs' claims with leave to amend on February 23, 2023, and Plaintiffs'

opportunity to amend their complaint four times, the Court finds that further amendment would be futile, and declines to grant Plaintiffs further leave to amend the complaint. *See, e.g., Jacobson v. Kings County Democratic County Committee*, 788 F. App'x 770, 774 (2d Cir. 2019) (summary order) (finding district court did not err in denying leave to amend when Plaintiff has had "the advantages of multiple pre-motion conferences and a prior opportunity to amend [the] complaint").

The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and close this case.

**SO ORDERED**

Dated:    December 19, 2023
          Brooklyn, New York

**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York